[657 NYS2d 158]

PROTE CONTRACTING Co., INC., Respondent, v BOARD OF EDUCATION OF THE CITY OF NEW YORK (VARIOUS), Appellant. (And a Third-Party Action.)

First Department, April 29, 1997

## APPEARANCES OF COUNSEL

*Cheryl Payer* of counsel *(Stephen J. McGrath, Jonathan S. Becker* and *Dona B. Morris* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

*Sheldon Feinstein, P. C.,* of counsel, Bayside *(Eric Slepian* on the brief; attorney), for respondent.

## OPINION OF THE COURT

Sullivan, J. P.

This appeal presents the issue of whether, in an action to recover payments allegedly due under work contracts with the Board of Education of the City of New York, a verdict in plaintiff's favor may stand in the face of posttrial evidence, not previously available, that plaintiff's principal had bribed a Board official to provide an interpretation of a contract specification that favored plaintiff's position on a key issue at trial.

Plaintiff commenced this action against the Board for contract balances and extra and protest work allegedly due on 13 similar window replacement contracts at various Queens schools. The Board counterclaimed for defective workmanship based on the premature and marked deterioration of the windows installed under the contracts.[1] A central issue at trial was whether the contract required plaintiff, in installing the windows, to use a procedure known as "back puttying." Plaintiff's entire case was presented through the testimony of its president, Theoclitos Demetriades, who claimed that back puttying was not required and that he relied on a determination to that effect by a Board official, Stuart B. Horowitz, the former Deputy Director of Maintenance in the Board's Division of School Facilities.

This litigation's origins go back to the 1980's when the Board embarked on a City-wide, multi-million dollar window modern-

---

1. Plaintiff instituted a third-party action, which was discontinued, against the supplier of the wood windows on the Board's counterclaims.

ization project. Plaintiff, one of a small number of contractors awarded Board contracts, repaired and replaced double-hung wooden windows at approximately 100 schools. By the mid-1980's, however, a City-wide scheme of corruption involving Board inspectors began to unravel, one effect of which, necessarily, was the interruption of the Board's payment process. As a result, payment on many of plaintiff's contracts with the Board were not completed, leading it to commence numerous lawsuits, including the instant one, initiated in 1987.

By 1989, the Board began to detect a premature and marked deterioration of the windows installed by plaintiff, leading the Board, in October 1992, to add counterclaims for breach of contract and seeking damages for the rotting windows. The Board also commenced its own separate action against plaintiff for the rotting windows. The latter action, broader in scope than the instant one, encompassed contracts plaintiff had at some 70 schools and necessarily overlapped the counterclaims asserted herein.

Plaintiff's theory in the instant case was that the Board's refusal to pay it the contract balances and for extra work was part of a vendetta, based on Demetriades' complaints about receiving multiple final punch lists with respect to plaintiff's work at Bayside High School. Demetriades testified as to the contract balances and in support of plaintiff's claim that work done under protest at Bayside High School was not required under the contract. Demetriades also testified that back puttying was not required by the contracts; he vouched for the custody and integrity of the only wood samples tested by plaintiff's wood preservative expert and he presented plaintiff's crucial damage evidence with respect to the Board's counterclaim.

On its counterclaim, the Board presented evidence in the form of survey results of the contracts at issue showing that 698 of the sashes installed by plaintiff between 1984 and 1986, i.e., approximately 10%, were visibly decayed as of July 1993. The Board showed that rotting became a problem as early as two years after installation. As it demonstrated, the proper installation of glass panes in windows requires that the pane be pressed into a bed of glazing compound placed on the sash where the pane is inserted. This is known as back puttying, a process that provides a seal between the wood and glass to prevent water penetration, particularly from water condensation on the interior side of the glass. Putty is then applied to the side of the glass that is exposed to the elements; this is known as face puttying.

The Board attempted to show that the contracts required back puttying and that plaintiff's failure to back putty was a contract breach and proximate cause of the rotting window sashes. Section 13.28 of the standard specifications applicable to the contracts provided: "Bed glass in glazing compound such that all spaces between glass and wood or metal are completely filled." Another provision, Section 1.5, provided that "[a]ny work indicated on the drawings and not mentioned in the specifications, or vice versa, is required and shall be performed by the Contractor same as if provided for both on the drawing and in the specifications."

The Board presented witnesses who testified that the contracts, specifically section 13.28, required back puttying. A retired Board employee and former chief area manager in the Bureau of Maintenance during the 1980's testified that the lack of back puttying would allow water to enter between the muntin bars, the wood strips that separate and hold the panes of glass within a grid-type sash, and the glass, subjecting wooden windows to premature rotting. An expert in wood products and their preservation testified that the omission of back puttying contributed to window failure by allowing condensation caused by the heat within the school rooms to penetrate the sash.

Demetriades supported his claim that back puttying was not required under the contracts by testifying that when failure to back putty was indicated on punch lists for several of the 13 schools involved herein, Horowitz, the Board's then Deputy Director of Maintenance, issued a memorandum, undated and not on Board letterhead, the original of which was found in plaintiff's files, stating that back puttying was not required under the contracts. As the Board's postverdict motion to set aside the verdict revealed, counsel for the Board, in preparing for the trial of this matter, contacted Horowitz to discuss the issue of back puttying. While Horowitz recalled ruling in plaintiff's favor on the issue, he could not remember the basis of his determination. As he was to admit in an affidavit submitted in support of the Board's postverdict motion, Horowitz had accepted a bribe from Demetriades to issue that determination.

Demetriades also testified that, notwithstanding the language of section 1.5 of the contracts' standard specifications, since back puttying was not shown on the drawing applicable to all Board wood window contracts, it was not required. Plaintiff also attempted to show that no other Board contractors had been required to back putty. In support of this position,

plaintiff called Louis H. Mahla, a former Board employee, who, according to the Horowitz postverdict affidavit, worked for Demetriades even before he left the Board's employ, in violation of the New York City Charter, the Board's conflict of interest regulations and the terms of the contracts. According to Mahla, who testified that he had not received a "dime" for his testimony and never had a business relationship with Demetriades, in the over 30 years that he worked for the Board writing specifications, inspecting window installations and supervising inspectors, he never saw a contractor back putty. By a five to one vote, the jury found that plaintiff had not breached its contracts by failing to back putty.

The Board also asserted that the wood windows installed by plaintiff had not, as required by the contract specifications, been treated with a water-repellent, antifungal wood preservative solution, thus causing the windows to deteriorate prematurely. The Board's expert, who had analyzed a randomly selected sample of windows at each of the 13 schools involved, found, on the basis of his testing, that the windows had not been treated with preservatives. The Board's specifications, he testified, were sufficient to preserve the windows. On the other hand, plaintiff's expert testified that he tested two wood samples for the presence of the required preservative and that the results were positive. The samples, leftover window parts from one of the school projects, never installed, and kept, according to Demetriades, in the shop for some nine years until provided to plaintiff's attorney, were not from the sash, the window part as to which rotting was a problem, but were from a part of the window that had not shown deterioration and did not involve back puttying. On the question of whether the requisite preservative had been used, the jury found in plaintiff's favor.

The Board also attempted to show that plaintiff had breached its contracts by failing to paint the windows with the number of coatings required to prolong the life of the wood. The Board's expert, through a technique known as photomicrochromotography, showed that the wood had not been painted, as required. Plaintiff's expert interpreted the photographs furnished by the Board's expert as showing the contractually required layers of paint. The jury found that plaintiff had not breached its contracts in this regard.

The Board presented evidence that plaintiff had failed, as required by the contract, to use butyl caulking compound at the joints where the muntin bars meet the bottom sash rails,

causing rot to radiate from the joint, which was not water tight. Plaintiff's expert testified that butyl caulking compound would have had no effect because, even if installed, it would have hardened within a year and cracked within four or five years and, therefore, would not have prevented premature decay. On this claim, the jury found both contractual breach and proximate cause, awarding the Board damages of $6,684—one dollar for every sash installed under the 13 contracts—a figure for which there is no support in the record. The Board's expert testified that, because the rot was progressive, all 3,342 windows under the 13 contracts should be replaced. The estimated cost of such replacement was $2.7 million. The cost of repairing only the sashes already showing rot, some 698, or 10.4% of the 6,684 sashes, would be $313,709. Even Demetriades, who testified that it would not be necessary to replace the entire sash, only the rotted bottom rail, estimated the cost, not including profit or overhead, at $70.10 per sash.

In defending against the Board's claim of rotting windows, plaintiff did not dispute that some 10% of the sashes it installed were rotting. It argued primarily that it had performed the work in accordance with the terms of the contracts and that if some windows were rotting the fault lay with the specifications, not plaintiff's work. Plaintiff was allowed to present evidence of work done by other window contractors and to show that windows they installed had also rotted. The Board, however, was precluded from showing that, under the same specifications, contractors other than plaintiff had installed windows that, more than a decade later, showed no signs of rot.

The jury returned a verdict in plaintiff's favor for $264,089, reduced to $257,405, before interest, by the $6,684 awarded to the Board on its counterclaim. After several meetings between the court, plaintiff and representatives of the Board, the Corporation Counsel and the Comptroller of the City of New York, agreement was reached, in light of the jury's verdict, that a proposed resolution settling all disputes between plaintiff and the Board, including controversies regarding other schools, would be submitted to the Board for consideration. On May 16, 1994, two days before the Board was to meet to consider the proposal, a Special Assistant United States Attorney then employed as the First Assistant Inspector General of the New York City School Construction Authority notified the Board's trial counsel that, based on allegations of illegal conduct by plaintiff and Demetriades bearing directly on the

issues raised in this lawsuit, he had undertaken to assure that the proposed settlement would not be approved. Specifically, the Special Assistant advised the Board's trial counsel of, *inter alia*, Demetriades' payment of a bribe to Horowitz for his favorable interpretation of the contract's specifications with regard to back puttying. The proposed resolution approving the settlement was withdrawn from the Board's agenda for consideration.

On May 19, 1994, the United States Attorney for the Southern District of New York, culminating a four-year joint Federal, City and State investigation into allegations of bribery, fraud and racketeering involving Board employees and contractors doing business with the Board, announced the filing of criminal charges against 18 persons, including Horowitz. On May 26, 1994, Horowitz pleaded guilty to each count of a felony information charging him with various crimes arising out of his activities in connection with private asbestos abatement contracts and a Board renovation project. Prior to entering the plea, Horowitz had advised law enforcement officials of criminal conduct by plaintiff and its president, Demetriades, bearing directly on this lawsuit. Horowitz set forth this conduct in a December 7, 1994 affidavit, which was to become the basis of the Board's motion to set aside the verdict.

In the affidavit, Horowitz stated that his contemporaneous 1986 review of the contract specifications supported the Board's interpretation that plaintiff's installation of windows without the use of back puttying was in violation of the contract, but that Demetriades subsequently visited him at his home and paid him a $10,000 cash bribe to rule, in his capacity as Deputy Director of Maintenance, in plaintiff's favor on the issue. In his affidavit, Horowitz told of other improper payments paid to him and to members of his family to influence the administration of contracts between the Board and plaintiff. When contacted by Board attorneys prior to the commencement of the trial herein as to the issue of back puttying, Horowitz, according to his affidavit, told them that he could not recall the basis of his earlier determination that back puttying was not required by the contract. In his affidavit, Horowitz also noted that Mahla, who testified favorably for plaintiff at the trial, had worked part time for plaintiff while still employed by the Board. According to Horowitz, Mahla, who had access to the Board's own cost estimates, would prepare bid estimates for plaintiff. Mahla also had the responsibility of evaluating change order requests submitted by contractors, including plaintiff.

When plaintiff, pursuant to CPLR 5003-a (b), moved for payment following settlement based on the earlier proposed global settlement of all plaintiff's disputes with the Board, the Board cross-moved, pursuant to CPLR 4404 and 5015, to dismiss the complaint or for a new trial on the basis of fraud and newly discovered evidence. Plaintiff, through Demetriades, denied Horowitz's allegations. The trial court denied plaintiff's motion because the Board had not approved the settlement as its terms required and, without explanation, denied the cross motion. A judgment in plaintiff's favor for $360,877.40 was thereafter entered. The Board appeals from both the denial of its cross motion and the judgment. We reverse and remand for a new trial.

CPLR 5015 (a) vests courts with the discretionary power to relieve a party from a judgment or order upon the grounds of, *inter alia*, "newly-discovered evidence which, if introduced at the trial, would probably have produced a different result and which could not have been discovered in time to move for a new trial under section 4404" or "fraud, misrepresentation, or other misconduct of an adverse party." (CPLR 5015 [a] [2], [3].) The party seeking relief on the basis of newly discovered evidence must show that the evidence is material, not merely cumulative, not of a kind as would merely impeach an adverse witness's credibility, that it would probably have changed the result and that the material could not have been previously discovered by the exercise of due diligence. (*Olwine, Connelly, Chase, O'Donnell & Weyher v Valsan, Inc.*, 226 AD2d 102.) Evidence discovered after trial that plaintiff's president and chief witness had, by payment of a bribe, procured from a key Board employee a determination material to a central issue at the trial is, it seems clear, the precise kind of situation for which the remedial effect of CPLR 5015 (a) (2) and (3) was intended. Of course, even without the benefit of CPLR 5015 (a), courts have always had the inherent power, which, although not plenary, authorized them to relieve a party from a judgment obtained as a result of fraud, mistake, inadvertence, surprise or excusable neglect. (*Matter of McKenna v County of Nassau, Off. of County Attorney*, 61 NY2d 739, 742; *Ladd v Stevenson,* 112 NY 325, 332.) CPLR 4404 and 5015 are codifications of this inherent power. (*McCarthy v Port of N. Y. Auth.*, 21 AD2d 125, 127.)

The newly discovered evidence in this case satisfies the criteria for CPLR 5015 (a) (2) relief as set forth in *Olwine, Connelly, Chase, O'Donnell & Weyher v Valsan, Inc. (supra)*. The

bribe evidence is highly probative, not merely cumulative, as to the Board's defense that plaintiff failed to comply with an essential contract term requiring back puttying. Whether back puttying was required was, as is conceded, the critical issue in the case. Thus, the newly discovered evidence does more than merely impeach Demetriades' credibility. In all probability, such evidence, if accepted, would have changed the trial result. And, as the record shows, the Board could not have learned of Horowitz's bribe taking before the verdict. Faced with Horowitz's inexplicable determination in plaintiff's favor made at the time the work was being performed, the Board's trial counsel, before the trial commenced, interviewed Horowitz, who, for obvious reasons, concealed the true reason for his ruling. In light of Horowitz's postverdict sworn allegations, "clear evidence of a gross fraud practiced upon the court" (*McCarthy v Port of N. Y. Auth., supra*, 21 AD2d, at 129), the trial court should have set aside the verdict and ordered a new trial.

As a matter of substantive law, Horowitz's allegations do more than merely provide the basis for granting a new trial. If established, they would require dismissal of the complaint. It is well settled that contracts, although legal in their inducement and capable of being performed in a legal manner, which have nonetheless been performed in an illegal manner, will not be enforced. (*McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465.) In *McConnell*, the Court permitted the defendant to assert defenses predicated upon the plaintiff's payment, not contemplated by his contract with the defendant, of a bribe to a representative of a motion picture producer in order to procure for defendant the distribution rights for certain motion pictures. The plaintiff sued to recover, as his agreement with the defendant provided, a stated percentage of the gross receipts from the distribution of the pictures. The Court held that, "[W]hatever be the law in other jurisdictions, we in New York deny awards for the corrupt performance of contracts even though in essence the contracts are not illegal." (*Supra*, at 470.) "[A] party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance." (*Supra*, at 471.) In so ruling, *McConnell* adopted the doctrine of illegal performance of contract set forth in Restatement of Contracts § 512 and 15 Williston, Contracts § 1761 (3d ed).

The courts of this State have consistently followed this principle. (*See, e.g., Ross Bicycles v Citibank*, 178 AD2d 388; *Babylon Assocs. v County of Suffolk*, 101 AD2d 207; *J. M. Deutsch*,

*Inc. v Robert Paper Co.*, 13 AD2d 768.) Without doubt, the conduct alleged on the part of plaintiff in offering a bribe to a key Board of Education employee as to a determination bearing on the issue of performance, if established, would be of a kind so gravely illegal and immoral and so inextricably connected with the contested question of performance under the contracts as to bar recovery thereunder as a matter of public policy.[2]

Whether the Board is entitled to a dismissal of the complaint will, of course, be determined by a resolution of the allegations of wrongdoing, which, as noted, plaintiff denies. In light of the serious nature of the allegations, on the retrial, the Board, as requested, should be allowed to assert a claim for punitive damages.

Accordingly, the judgment of the Supreme Court, New York County (Edward Lehner, J.), entered May 9, 1995, awarding plaintiff the sum of $360,877.40, should be reversed, on the law and the facts, without costs or disbursements, and the matter remanded for a new trial. The appeal from the order of the same court and Justice, entered on or about April 10, 1995, denying defendant's cross motion, *inter alia*, to set aside the verdict, should be dismissed as subsumed in the appeal from the judgment.

ROSENBERGER, WALLACH and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, entered May 9, 1995, which awarded plaintiff the sum of $360,877.40, reversed, on the law and the facts, without costs or disbursements, and the matter remanded for a new trial. The appeal from the order of the same court and Justice, entered on or about April 10, 1995, is dismissed as subsumed in the appeal from the judgment.

---

2. Indeed the conduct alleged is violative of criminal statutes (*see, e.g.,* Penal Law §§ 180.00, 180.03, 200.00, 200.20, 105.05), as well as conflict of interest rules. Similarly, plaintiff's alleged use of Mahla, a Board employee, to obtain confidential information in the bidding process, if established, would constitute criminal conduct and violate conflict of interest rules.